Okay. The first case on our docket this morning is Heeple v. Jesse Bell. Ms. Tassie? Lassie. Lassie. I'm sorry. I didn't know if it was a T or an L. Sorry about that. It's okay. Printing is a good thing. Go ahead. You're ready. May I please report, counsel? My name is Jennifer Lassie with the Office of the State Appellant Defender, and I represent the defendant's appellant, Mr. Jesse Bell. The state has conceded that this case could be remanded for a crank or inquiry into Mr. Bell's ineffective assistance complaint. However, because the record demonstrates, as argued in Argument 1B, that there was overwhelming evidence of ineffective assistance here, Mr. Bell respectfully requests this court reverse the remand for a new trial. I would like to focus on Argument 1B because it is dispositive and requires reversal. Mr. Bell was denied his right to effective assistance of counsel, where trial counsel allowed the jury to be inundated with numerous references to irrelevant and highly prejudicial footage of the interrogation videos. Now, the state has conceded that Mr. Bell's trial counsel acted unreasonably in failing to suppress those irrelevant portions of the interrogation video, so the only question here is prejudice. Well, it's not just prejudice, is it? I mean, the prejudice has to have some effect. Well, the only question is whether Mr. Bell was prejudiced by trial counsel's failure to redact those interrogation videos. Prejudice in what way, such that there was? The outcome of the trial. Would it have been different? Well, yes, not only that, but we cannot be confident in the outcome of the trial as required by the Strickland standard. So that's the problem that you're going under for prejudice? Yes, Your Honor, because the state has conceded that those portions of the video should have been redacted. Now, Mr. Bell was on trial for first-degree murder, and he was arguing self-defense. So I think the better question here is how was he not prejudiced by trial counsel's failure? How was Mr. Bell not prejudiced when the jury heard that he killed a man 10 years before and had been drinking that night and that an alternate patient occurred that night, too? How was he not prejudiced when the jury learned he had a pending domestic battery charge for a fight with his girlfriend that was so serious he thought he was facing 30 years for the offense? How was he not prejudiced when the jury heard that he hit a man and put him in the hospital and spent three years in prison for the incident? That if Mr. Bell got into any trouble, he could be given an extended and enhanced sentences? That Mr. Bell had some involvement in a vehicle blowing up? That police were familiar with Mr. Bell and that Officer Brown knew he had a reputation as a brawler that liked to fight with his fists? That Mr. Bell used meth and synthetic marijuana? That he had recently served a six-year prison sentence? That Mr. Bell had spent about 12 years or half of his life in prison? How was he not prejudiced when the jury heard that he had been in prison so much that he considered himself institutionalized? That he had been in prison so much that he had only spent about three months with his nine- and ten-year-old children? And that he found that prison turns a man into an animal and eats his mind up? When determining whether Mr. Bell had committed first-degree murder and whether he had acted in self-defense, the jury had learned all of this evidence when it went to the right. And not only did they hear this, but just before the videos were played, the trial court told the jury these videos are important. The court told the jury they were important evidence. The court told the jury to focus on the videos. Twice the court said take notes. Three times the court told the jury to pay attention to these videos. Now the state argues that the jury instruction, I don't have the number in front of me, I believe it's 3.14, helped to cure any potential prejudice that might have occurred here. However, that instruction was not given until the very close of the evidence, and it only instructs jurors what to do with evidence of a previous conviction, not all of this other stuff about pending charges, prior bad acts, prison sentences. So it really had no effect to cure the prejudice that occurred here. Counsel? Yes, Your Honor. Doesn't the case have to be closely balanced for this to even come into play? It does, Your Honor, and the evidence here was close. That's evidenced by the fact that even with all of this terribly prejudicial stuff coming in, the jury still struggled to reach a verdict. The jury told the court seven jurors had found all propositions of first-degree murder, while five had not, and then only after receiving the prim instruction and deliberating several more hours did they come back with a verdict of second-degree murder. So the evidence here was close. Mr. Bell was the only testifying witness who was consistent from the point of interrogation through trial. If the court holds a Kranko hearing and finds that the defense counsel was ineffective, what would happen in your mind? At that point, he would be given a new trial. However, I think it's a little bit... So would you want us to skip that step that the State concedes and go ahead and make that finding? Well, Your Honor, the State also concedes the first prong of Strickland has been met, that counsel acted unreasonably. And I think with this record overwhelmingly establishing ineffective assistance, it would be a waste of judicial economy to remand for a Kranko inquiry to see what else counsel might have failed to do. I think the record is clear here that we have ineffective assistance just based on what we know. How do you distinguish the Supreme Court case of People v. Henderson where they found that the admission of the irrelevant portions of the confession still did not constitute a reversible error? I'm not familiar with Henderson's facts, but the evidence here was close. So in arguing that the evidence was close here, Mr. Bell does not have to establish that he was not the initial aggressor or that no rational person would find him guilty of the offense. But if we make a finding that the evidence was not close, do you think we usurp the ability of the trial court to make the relevant Kranko inquiry? In other words, if we make a finding that you want, that becomes the law of the case, right? Yes, Your Honor. So if we rule against you, are you taking the risk that now you've foreclosed your client's ability to have that Kranko inquiry? I think if Your Honor's find that the evidence was not closely balanced or that Mr. Bell was not prejudiced, alternatively you could remand for a Kranko inquiry into his claims to see what else counsel did. However, I think the record's clear that he was prejudiced here, that the evidence was close. So again, hypothetically, if we go the other way, you think he would still be entitled to a Kranko hearing and our findings would not necessarily prejudice your client's position? If Your Honor's found that he could not establish ineffective assistance with this record, then yes, I believe he could still pursue, I think there would still be a Kranko inquiry into whatever other claims remain that are not in the record. But are not in the record before us. Right, right. With this record, it is sufficient to find ineffective assistance to counsel, and it does require reversal and remand for a new trial. However, if Your Honor's disagree with me, I think you can still remand to see what other claims Mr. Bell might have had that couldn't be fleshed out because there were no inquiry into them. But with this record, we have the entire trial transcript. Well, Your Honor, so he made some post-trial complaints about counsel's effectiveness. I saw that at sentencing, but I thought there was no post-trial motion filed. Was there a post-trial motion filed? I believe trial counsel did not file a post-trial motion. I think so. But the comments that he made during the sentencing phase was what the State kind of concedes would, in light of a new Supreme Court relative or recent Supreme Court case, would require a Kranko. So that's correct based on, so what happened at post-trial was he made some sort of effective assistance complaints about his counsel. When you talk about post-trial, you're talking about the sentencing phase, not the motion. Or after trial. Yeah. So at sentencing, Mr. Bell made some complaints about his counsel. We don't know what exactly those complaints were because, though that triggered the court's duty to inquire under Kranko, the court didn't inquire into his complaints. So we don't know what else might be out there that counsel failed to do or did that he shouldn't have done. But I think it's our position that we don't need to know in order to find ineffective assistance because this record's so terrible with what happened at the trial court with these videos that it's just a waste of judicial economy to go on a fishing expedition to see what else he did wrong. Because I think the record's clear, as argued in Section 1B, that this was ineffective assistance. So the evidence was close. Mr. Bell was consistent throughout the interrogation and that trial that he only hit Morrison four or five times, and he explained he thought Morrison was getting up. Now, Mr. Bell did make some incriminating statements. However, in context, it's clear from those videos that he was easily led by police and agreeable. Officer Brown would suggest, well, maybe you blacked out because witnesses are saying this. Maybe you hit him more. You'll have a chance to speak again. Thank you. Is she going to hand? I just want to start off the box with a question I asked opposing counsel. Do you think that if the court makes findings about the closeness of the evidence and whether it was prejudiced that it precludes some issues at the Krankel hearing? If this court, after a complete review of the entire record, determines that defense counsel was not ineffective, then there is absolutely no need for a Krankel hearing because a Krankel hearing only requires a trial court to speak to the defendant, speak to the defense counsel, or make its own conclusions based on what he saw in the trial to determine whether there's any basis for a claim of ineffective assessment of counsel. And only if he does that is new counsel appointed for a claim of ineffective assistance. That superficial claim that's in a Krankel remand cannot possibly be compared to the review that this court is going to give by going through this entire record and determining whether there was ineffective assistance. So I guess my question is if the State concedes that the Krankel hearing is necessary, are you asking this Court not to go that step further, to find and to discuss ineffective assistance? The State is conceding that under the Supreme Court rulings that the defendant said enough that the Court should inquire. However, I mean, I don't know how I could have argued differently, but as I said, that's a very superficial inquiry. And I do believe that if this Court finds that defense counsel was effective, then the review that this Court gives is so much more in-depth than a Krankel hearing that it moves the issue of Krankel. So this is why I think that defense counsel was not ineffective. Justice Sotomayor, I wanted to address your question about whether this evidence was close, and I think there was some mention of the jury had trouble deciding. I urge this Court to look carefully at the jury instructions that were given to this jury. There were first-degree murder factors, self-defense, litigation, accountability, proximate cause, initial aggressor, duty to retreat, justification, verdict proof for justification. They then requested before they said anything about having trouble reaching a decision, they requested a definition for second-degree murder. And in a case like this, there is no instruction for second-degree murder, so per the agreement of the parties, the trial court answered the question this way. That he directed the jury to the proposition, instruction, and mitigating factor, justified force, use of force, initially provoked, and no duty to retreat. It's not too surprising that the jury found all of these instructions hard to understand. And I think that led a great deal towards them having, initially having, moreover, they were given a pen instruction. They delivered it for quite some time afterwards. They came to a unanimous verdict, which they affirmed after the finding. So here's what they, here's what convicted this man. First of all, we have the undisputed facts that the defendant and Mr. Morrison got in a fist fight, that the defendant's cousin, Travis Turner, hit Mr. Morrison in the head with a two-by-four, that the defendant hit Mr. Morrison a number of times in the head with his fists after Mr. Morrison fell to the ground. That's from the testimony of Patrick Turner, Jennifer Turner, and the defendant himself. It's also undisputed that both the blow with the two-by-four and the punches contributed to Mr. Morrison's death. Now let's look at the defendant's testimony at trial. He said he wanted Travis to strike Mr. Morrison with a two-by-four. He said he positioned Mr. Morrison so Travis could lay him out. He admitted that he hit Mr. Morrison in the head several times after he fell to the ground. He twice testified that he lost his cool at that moment. For example, when asked if Mr. Morrison was not fighting back when he was lying on the ground, the defendant answered, I told you, I lost my cool. The defendant also admitted that his family pulled him off Mr. Morrison, but he broke loose and returned and hit Mr. Morrison some more. Now in the state's brief, I went in great detail to the portions of the interview that were proper admissible admissions in that interview. I'm not going to go through all of them here. I'll touch on a few. The defendant in the interview said he was furious. His rage built up. He got seriously vicious mad. He intended that Travis should hit Mr. Morrison with the board, and he did. After Travis hit Mr. Morrison, he immediately fell face down and did not move. He said that twice. He said he didn't move after twice. He twice said that Mr. Morrison was defenseless at the time. He said after Travis took, and this is the defendant's word, took the green light and hit Mr. Morrison, he took the green light and, here I quote, showed Mr. Morrison how I play you don't fuck with me. The autopsy was consistent with the admissible portions of the confession as well. Yes, correct. So it's not just a credibility issue with regard to the defendant. We had additional witnesses testifying, non-charged witnesses, non-indicted witnesses, as well as the medical examiners or physicians' evidence tying the two together. Absolutely. For example, Patrick Turner, who was, by the way, the only person there not drinking. Patrick was related to both of the defendants in this case, both Travis and this defendant. He said that Mr. Morrison threw the initial punches at the defendant and defendant blocked him, that Travis hit Mr. Morrison with a board, and when that happened, Mr. Morrison fell to the ground, that the defendant hit Mr. Morrison in the head after he fell, that he and his son pulled the defendant off of Mr. Morrison and the defendant pulled loose and went back and hit Mr. Morrison again. All of those things the defendants said too. Then Patrick went on to say these things. He said Travis was standing on the porch and the defendant told Travis, here I quote, Fuck it, Travis, just go ahead and hit him. Whereupon Travis hit Mr. Morrison. Mr. Morrison staggered from the blow. Defendant hit Mr. Morrison again. Mr. Morrison fell to the ground unconscious. Defendant jumped on Mr. Morrison's back and started punching Morrison in the head. Patrick and his father Ricky pulled the defendant off Mr. Morrison after the defendant hit him eight or ten times. The defendant started to turn away but pulled away and ran back and started punching Mr. Morrison again and that Mr. Morrison was unconscious when the defendant hit him. Ms. Shanahan, what effect, if any, do you think Mr. Bell's statement regarding not wanting to get Travis in trouble has on this evidence? Well, I think, I mean, the defendant argues that Patrick was a liar and made this whole thing up to support his son, or brother. But the thing is, Travis was a kid. Travis did a really stupid thing. And both of his family members, both Patrick and the defendant, they did everything they could to keep Travis out of this. So I think that the defendant's efforts to keep Travis out of it make any allegation that Patrick is lying to support his family members is spurious. I mean, he did the same thing. The defendant did the same thing. He repeatedly said the only thing I lied about was Travis' involvement in it. He went on in that interview saying, and then somebody hit him. And then, you know, again, I go in detail in our brief as to what the defendant did to keep Travis out of it. That's just exactly what Patrick did. Patrick no more can be considered. Patrick cannot be considered to be a liar simply because he's trying to support a family member. The defendant did the same thing. They were just trying to keep him out. So I'm trying to figure out what the State is asking this Court to do. Affirm. Just affirm. And because if we affirm, you would find the evidence is overwhelming, no plain error occurred. Because no plain error occurred, there's no need for a crankle hearing. Yes. Counselor, in your brief, you asked us to remand for a crankle hearing. That's the tension that I'm trying to figure out. I asked for a crankle hearing because I feel like the law says if a defendant says anything, he's entitled to a crankle hearing. I have no problem with you finding that defense counsel was not ineffective and then sending it back to the trial court and asking him the same question only on the very superficial basis that crankle requires. I just don't understand how we can do that. So if you find the evidence was overwhelming, that there was no plain error, so to speak, which is, I think, what we're left with since there's no post-law motion. Well, what is there left for a crankle hearing? Nothing. That's what I'm trying to decide. There's nothing left for a crankle hearing. It's more of a question. I don't think it's so much plain error since we're dealing with ineffective assistance of counsel. I think we're talking. Go ahead and finish that. I think we're talking about whether the admission of these portions of the interview. Right. The prejudicial list. The prejudicial column of Strickland is what we're dealing with, and I think that there is so much evidence that supports the finding that he was effective and that this plea prejudiced the defendant. Okay. And that was my misstatement, Strickland. Thank you. Thank you, Your Honor. Ms. Lassie, you need an extra couple of minutes because of her continuation. I'll give you that. Thank you, Your Honor. So first, just with the crankle, I do believe this Court does a more thorough, definitely a more thorough inquiry into ineffective assistance complaints than would occur with a crankle inquiry. However, the crankle argument was raised because we believe there are enough, we believe there is enough in this record to absolutely establish ineffective assistance occurred here. However, we felt that if this Court believed differently, what were those complaints that Mr. Bell wanted to make and didn't get to flesh out for the record? Were they things that aren't in this record? We don't know. You know, was he going to complain about witnesses or evidence that didn't happen? We don't know because the Court didn't do the crankle inquiry. So our position is that with this record, you can find ineffective assistance and reverse and re-infer a new trial, and that that would be the most economical way to handle the case if Your Honor's find that there is an effective assistance with Argument 1B. So I want to first start with a unanimous verdict is not established that the evidence was not close. Otherwise, we'd never be able to establish that the evidence was close on appeal. This, the case, let's see, the evidence was close here. Mr. Bell insisted throughout the interrogation and that trial that he only hit Morrison four or five times. But didn't he also say he blacked out, he thought? So he did not say he blacked out. Officer Brown suggested he could have blacked out, and Mr. Bell agreed he could have blacked out. So he didn't come up with that. But he did agree with Mr. Brown, and he would agree with Officer Brown a lot. Officer Brown would insist, well, witnesses said they hit him 20, 30, 40 times, and Mr. Bell would insist he only remembered hitting him four or five times. And even when Mr. Bell conceded that maybe he did black out, he still followed that contemporaneously, saying, but I really only remember hitting him four or five times. Well, that might be consistent with blacking out, then. That's true. But, again, we're not here to establish that no rational trial could find him guilty. We're just arguing the evidence was close. Now, Jennifer Smith, she didn't see the whole fight. She only saw the end. And her testimony was that Morrison couldn't fight back. But she didn't clarify, and the state didn't ask her to, as to whether that was because the position Morrison was in or because he was unconscious. And this really came down to a credibility contest between Patrick Turner, who from the moment he talked to police began lying, and Mr. Bell. Now, Mr. Bell was intimidated and scared of Morrison, and he was clear about that in these interrogations. Morrison was a 6'2", 250-pound man. The state's witnesses established he was an alcoholic. Mr. Bell was 5'10", and 30 pounds lighter than him. The evidence established that Morrison was drunk that night, and that without provocation he elbowed Mr. Bell in the face earlier in the night, and that Mr. Bell did nothing. Now, with respect to the board, the state argues that Mr. Bell positioned Morrison to get laid out with the board, as if this were some sort of preplanned event before Mr. Bell entered the house. However, Mr. Bell's statement in context establishes exactly the opposite. He said, and again, I think this is in context, this is his attempts to protect Travis Turner. He says, I don't know if I, I could say I even positioned him to get laid out, you know, if that's the case. He was moving like that, and I'm moving around because I'm going back towards the truck. My thoughts were to get back in the vehicle and leave if I can. Never once did I think that anyone was going to lay him out with a club. So when you put that whole quote in context about positioning him, it's clear he didn't think he was literally positioning him to get struck with this board. As for the green light comment, it's an unfortunate use of words by Mr. Bell, and the state seized upon that language at trial, and they're doing it here on appeal. The green light that Mr. Bell gave to Travis to hit Morrison with the board was eye contact. It was nothing more than eye contact, and he insisted on that during interrogation and at trial. He gave him a look. So I think, I mean, this was clearly a drunken brawl that went awry. It fell off the rails. But because of that, you have all these extra witnesses that the state produced that mitigates against the overwhelming, that supports the overwhelming evidence fraud. What about all those extra witnesses? This isn't a case that rises or falls on, you know, a piece of evidence found in the defendant's statements. So I don't think that the state had a ton of witnesses that established overwhelming evidence. Mr. Morrison had bruises on the side of his head, and he did have some on the back. Some? Yes, Your Honor. He had some serious blows to his head. Yes, and one of them I think was from the major one that caused the linear abrasion and contusion in the mouth was from the board. The state's witnesses established that. However, Mr. Bell doesn't have to establish that no rational trier of fact, you know, couldn't have found him guilty. It's whether it was close here, and we believe it was. Okay. Thank you. Thank you, Your Honor. The court would like to welcome the state's attorney in our courtroom today. Thank you for coming. We don't often see you. You're welcome. Good evening. Thanks. Okay. This case will be taken under advisement, and an opinion or an order will be issued in due course.